**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **Stephanie Watson** and **Lori Quist**, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>**Wells Fargo Bank, N.A.** and **Wells Fargo Home Mortgage,**<br><br>  Defendants. | Case No. 12-cv-8578<br><br>Judge: Robert W. Gettleman<br><br>Magistrate Judge: Sidney I. Schenkier |

<u>**AMENDED COMPLAINT**</u>

1.     Plaintiffs Stephanie Watson and Lori Quist (collectively, "Plaintiffs") bring this complaint individually, and on behalf of a class of similarly situated individuals against defendants Wells Fargo Bank, N.A. ("Wells Fargo") and its division Wells Fargo Home Mortgage ("WFHM") (collectively referred to as "Defendants").  Plaintiffs bring this class action complaint because of three distinct illegal practices by Defendants.  First, Defendants intentionally and/or negligently misrepresented the requirements of Federal loan modification programs, advised Plaintiffs and others to miss mortgage payments in order to qualify for mortgage modification programs, failed to actually modify mortgages, and charged Plaintiffs and class members, among other things, substantial fees and penalties for missing mortgage payments.  Defendants also reported delinquent payments to the credit reporting agencies.  Defendants misrepresented the requirements of the mortgage modification programs in order to avoid making modifications and to induce missed payments by borrowers.  Once borrowers missed payments, Defendants

then charged and collected significant fees and penalties. This class is referred to herein as the "Pre-Application Mortgage Modification Class."

2.     Second, in the course of applying for a Federal loan modification, Defendants intentionally and/or negligently misrepresented to homeowners that they should continue to miss mortgage payments while their applications are being processed or until such time that they are advised of the new trial period payments. During this period of time, Defendants charged and collected significant fees and penalties, reported delinquent payments to the credit reporting agencies and even initiated foreclosure proceedings against the homeowner. This class is referred to herein as the "Post-Application Mortgage Modification Class."

3.     Third, Defendants failed to pay customers interest on funds that Defendants held in so-called "Unapplied Funds" or suspense accounts. In the aggregate, Wells Fargo held large sums of money in these accounts. These funds were neither credited to customers' mortgage loans, nor were they returned to customers. This practice resulted in an unfair windfall to Wells Fargo to the detriment of its customers. This class is referred to herein as the "Unapplied Funds Class."

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 which confers the district courts with original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which at least one class member is a citizen of a State different from any defendant.

5.     This Court has personal jurisdiction over Defendants because they have an office in this District and a substantial portion of the acts complained of in this Complaint took place in Illinois.

6.     Venue is proper in the Northern District of Illinois because Defendants have an office in this District and many of the acts complained of in this matter occurred in this District.

7.     Defendants directly or indirectly used the means of interstate commerce, including, but not limited to, the mail, interstate wire, and telephone communication in connection with the actions alleged in this complaint.

## PARTIES

8.     Plaintiff Stephanie Watson is a citizen of Illinois.  At all times relevant to this matter, Plaintiff was subject to the deceptive, fraudulent, and misleading practices of Defendants, and was damaged as alleged herein.

9.     Plaintiff Lori Quist is a citizen of Illinois.  At all times relevant to this matter, Plaintiff was subject to the deceptive, fraudulent, and misleading practices of Defendants, and was damaged as alleged herein.

10.     Defendant Wells Fargo Bank, N.A. is a Delaware corporation with headquarters in San Francisco, CA.  Wells Fargo originates and services retail mortgages throughout the United States.

11.     Defendant Wells Fargo Home Mortgage is a division of Wells Fargo.

## BACKGROUND FACTS

12.     In the fall of 2008, the United States experienced an unprecedented financial crisis.  Bear Sterns and Lehman Brothers failed, unemployment suddenly rose to 6.2 percent by September, the Treasury Department took Fannie Mae and Freddie Mac into conservatorship, the

Federal Reserve began an $85 billion taxpayer-funded bailout of AIG, FDIC took the nation's largest savings and loan, Washington Mutual, into receivership, and the S&P 500 lost an additional 10% of its already declining value.

13.      In response to this crisis, the Government passed the Emergency Economic Stabilization Act of 2008 (the "ESSA"). The ESSA created, among other things, the Troubled Asset Relief Program ("TARP"). The establishment of TARP granted the Treasury Department unprecedented authority to spend billions of dollars to "restore liquidity and stability to the financial system of the United States." The Final Report of the TARP Congressional Oversight Panel estimated that the program will cost taxpayers $25 billion. *See* Congressional Oversight Panel, *The Final Report of the Congressional Oversight Panel*, March 16, 2011 at p. 9 (the "Final Report").[1]

14.      In addition to the trouble in the financial markets, the U.S. housing market was also in steep decline at the end of 2008. The housing market reached its peak in 2006, and then began a huge slide. Millions of Americans faced the prospect of foreclosure.

15.      In 2007 and 2008, the federal Government attempted to address the deteriorating housing market with the FHA Secure foreclosure mitigation program, HOPE for Homeowners, and an FDIC IndyMac loan modification program. Unfortunately, none of these programs were very successful and the housing situation continued to worsen.

16.      In March 2009, the Treasury Department rolled out the Home Affordable Modification Program ("HAMP"). The goal of HAMP was to prevent three to four million foreclosures. HAMP was initially given $50 billion in funding to provide incentives to mortgage ser-

---

[1] The Final Report was originally available at: http://cop.senate.gov/reports/library/report-100909-cop.cfn, now available at:
 http://cybercemetery.unt.edu/archive/cop/20110401223133/http://cop.senate.gov/reports/library/report-031611-cop.cfn.

vicers to assist homeowners with HAMP modifications in order to keep their homes. The intent of the HAMP program was for large banks, such as Wells Fargo, who received TARP funds, to participate in the program for their entire mortgage portfolio.

17.     Although participation in the HAMP program was voluntary for servicers of non-Government Sponsored Enterprises, servicers that were owned or guaranteed by Fannie Mae or Freddie Mac were required to participate in the HAMP program. Wells Fargo was a servicer of loans that were owned and/or guaranteed by Fannie Mae and Freddie Mac. As a result, Wells Fargo was required to participate in the HAMP program.

18.     The Federal Government provided all bank participants in the HAMP program with detailed requirements for homeowners who wanted to participate in the program. In addition to more specific requirements provided by the Treasury Department, a homeowner must satisfy the following basic requirements to qualify for a HAMP mortgage modification:

   a.   The home must be owner-occupied, not vacant or condemned;

   b.   The remaining balance on a single-unit home cannot exceed $729,750;

   c.   The borrower must actually be delinquent, or default must be reasonably foreseeable, and able to demonstrate financial hardship, including that the borrower has insufficient liquid assets to make the now-required monthly payments; and

   d.   The borrower must have a monthly "front-end" debt-to-income ratio of more than 31% (i.e., the borrower's monthly mortgage payment must be greater than 31% of the borrower's gross monthly income).[2]

---

[2] U.S. Department of Treasury, *Introduction of the Home Affordable Modification Program*, Supplemental Directive 09-01, at 6, April 6, 2009. Available at:

19.     If each of the above basic requirements is met, Wells Fargo must then apply the Treasury's Net Present Value ("NPV") calculation to the homeowner's situation.  This model determines the NPV of the mortgage under a modification verses the NPV of the mortgage with no modification (this usually involves a foreclosure or a short sale).  If the value of the mortgage is greater with a modification, the mortgage is NPV positive and the servicer is required to offer a HAMP modification.

20.     The next step required of HAMP servicers is to conduct a "waterfall" analysis to determine what kind of modification to apply to the specific homeowner's situation.  The first step in the "waterfall" analysis is to determine if an interest rate reduction would bring the monthly debt-to-income ratio below 31%.  If not, the next step is to determine if extending the loan term (up to 40 years) would bring the monthly debt-to-income ratio below 31%.  If not, for-bearance is required.

21.     Once approved for a HAMP modification, a homeowner who participates is typi-cally put into a three month trial modification during which payments are made according to the modified loan terms. If the homeowner makes timely payments during the trial period, the homeowner must be offered a permanent modification.

22.     HAMP participation by servicing companies such as Wells Fargo was memorial-ized by the signing of a Servicer Participation Agreement.

---

www.hmpadmin.com/portal/programs/docs/hamp-servicer/sd0901.pdf.

23.     As a condition of participation in the program, and receiving payments under the program, the Participation agreement requires Wells Fargo's "adherence to the Program standards . . . for all the servicer's loans."[3]

24.     Wells Fargo was required to "perform the Services for all mortgage loans it services, whether it services such mortgage loans for its own account or for the account of another party," and "shall use reasonable efforts to remove all prohibitions or impediments to its authority, and use reasonable efforts to obtain all third party consents, waivers and delegations that are required, by contract or law, in order to perform the Services."  Amended Agreement at Sec. 2. A. & B, a copy of which is attached hereto as Ex. 1.

## FACTS PERTINENT TO PLAINTIFFS

25.     Wells Fargo engaged in a pattern and practice of advising borrowers to miss mortgage payments in order to qualify for the HAMP modification program.

26.     Missing a mortgage payment was not, and has never been a requirement to participate in the HAMP program.

27.     In addition, during the course of applying for a loan modification, Wells Fargo instructed borrowers to continue to miss payments until they are given a new trial period payment amount.

28.     Once a customer follows the instructions of Wells Fargo, Wells Fargo sends a default notice to the borrower, immediately assesses significant fees and penalties, and reports the borrower's missed payment to the credit reporting agencies.  Wells Fargo also often begins fore-

---

[3] Congressional Oversight Panel, *A Review of Treasury's Foreclosure Prevention Programs*, December 14, 2010 at 14 (the "December Report"). Originally available at:
http://cop.senate.gov/reports/library/report-121410-cop.cfm, now available at:
http://cybercemetery.unt.edu/archive/cop/20110402010243/http://cop.senate.gov/documents/cop-121410-report.pdf.

closure proceedings against the borrower who followed Wells Fargo's instructions, thereby triggering additional fees and penalties.

**I.      Plaintiff Stephanie Watson's Experience With Wells Fargo Mortgage Modification**

29.      On or about April 2010, Plaintiff Stephanie Watson contacted Wells Fargo to inquire about a mortgage modification.

30.      Plaintiff Watson was told, among other things, to fill out application materials and send them to Wells Fargo.  Plaintiff Watson completed the application materials.  Plaintiff Watson followed up on her application regularly.  Unfortunately, Plaintiff Watson did not receive any consistent information from Defendants.  She was told at various times that her application was still being processed, that Wells Fargo was waiting for additional information, and that she needed to give them more time to process the application.  Plaintiff Watson was diligent in following instructions from Wells Fargo and promptly sent any additional information Wells Fargo requested.  In spite of this, Wells Fargo made little to no effort to process her modification.

31.      After about six months of making numerous phone calls to Wells Fargo with little results, on or about October 2010, Plaintiff Watson was told by a Wells Fargo representative that in order to qualify for a mortgage modification she needed to miss a mortgage payment.  Plaintiff Watson was told that the fact that she had never missed any payments up until that time was why her modification was not processed.  Wells Fargo advised Plaintiff Watson to not make her November 2010 mortgage payment.  Relying on this advice from Wells Fargo, Plaintiff Watson intentionally missed her November 2010 mortgage payment.

32.      After missing this payment, Plaintiff Watson called Wells Fargo to inquire again about a loan modification, but she was told that they are no longer available because the stimulus money ran out.  Plaintiff Watson also received a letter from Wells Fargo telling her that her loan

was in default. Wells Fargo charged Plaintiff Watson late fees and penalties and told her that if she didn't bring her account current, she would face foreclosure. To add insult to injury, Wells Fargo told Plaintiff Watson that she could call to obtain a list of home ownership counseling agencies designed to "help homeowners avoid losing their home."

33. Plaintiff Watson then spent the next several months trying to decipher Wells Fargo's statements and sort through all the late fees, extra interest, and penalties in order to catch up on the missed payment and bring her account current. During this time, Wells Fargo provided no help to Plaintiff Watson, continued to add fees and penalties, and gave her incomplete and incorrect contact information.

34. After Plaintiff Watson followed all of Wells Fargo's instructions, and after Plaintiff Watson brought her account current again, Wells Fargo did not modify Plaintiff Watson's mortgage. To this day, in spite of continued attempts to get a modification, Wells Fargo has not modified Plaintiff Watson's mortgage.

35. Plaintiff Watson's experience is typical of borrowers throughout the country. Wells Fargo induced individuals to miss mortgage payments in order to qualify for mortgage modification and then charged them penalties and fees for missing the payments and ultimately not modifying the mortgages.

**II.     Plaintiff Lori Quist's Experience With Wells Fargo Mortgage Modification**

36. In or around February or March of 2011, Plaintiff Lori Quist contacted Wells Fargo to inquire about a mortgage modification. The Wells Fargo representative told her that because she was in good standing there was nothing they could do and that they could not even transfer her to the appropriate people who handle loan modifications because she was in good

standing on her loan. Plaintiff Quist contacted Wells Fargo again to inquire about a mortgage modification in or around June of 2011, but was again told that she did not qualify.

37.     In or around January or February of 2012, Plaintiff Quist contacted Wells Fargo to again inquire about a mortgage modification. The Wells Fargo representative told her that she did not qualify for the federal programs because she never had any problems with her mortgage. The Wells Fargo representative further told her that if she missed mortgage payments she would qualify for a loan modification. Plaintiff Quist stopped making payments on her mortgage based on this advice.

38.     After missing her first mortgage payment, Plaintiff Quist began putting together her documents and the application for a loan modification. On or about March of 2012, Plaintiff Quist submitted her application for a loan modification. At or around that time, Plaintiff Quist was told by Wells Fargo to continue to not make payments on her mortgage while her application is being processed and a trial payment amount is established. In response to this advice, Plaintiff Quist expressed concern to the Wells Fargo representative about being placed into foreclosure, but the Wells Fargo representative told her that they will not foreclose on her home and that she does not need to worry.

39.     Over the next several months, Wells Fargo gave Plaintiff Quist the run around by asking for more documents, by claiming that they did not get documents she already sent them and by requesting new bank statements. In or around June of 2012, she was contacted by Wells Fargo and told that they had put her house into foreclosure. She continued to call Wells Fargo in an effort to resolve the matter, told them that they were the ones who told her to miss payments and repeatedly offered to pay all amounts past due on her mortgage. During this time, Plaintiff

Quist was never informed by Wells Fargo as to whether or not she qualified for a trial period plan or what the trial period plan payments would be.

40.     Ultimately, Plaintiff Quist paid Wells Fargo all past amounts due, including all late fees and charges and approximately $3,000 in attorneys' fees.  Despite all of this, Wells Fargo never modified Plaintiff Quist's mortgage.

41.     Plaintiff Quist's experience is typical of borrowers throughout the country.  Wells Fargo induced individuals to miss mortgage payments in order to qualify for a mortgage modification, instructed them to continue to not make mortgage payments until a decision is made on a trial period plan and then charged them penalties and fees for missing the payments and ultimately not modifying the mortgages.

### III.    Plaintiffs' Experiences With  Wells Fargo's Failure to Pay Interest on Unapplied Funds

42.     According to the terms of Wells Fargo's mortgage contract, Wells Fargo is not obligated to apply any partial mortgage payment that is not sufficient to bring the mortgage loan current.  Instead, Wells Fargo can hold the partial payment until the borrower makes sufficient additional payment to bring the mortgage loan current.  However, Wells Fargo is obligated to pay interest to the borrower on any unapplied funds unless Wells Fargo applies the funds to the mortgage on the scheduled due date.  Specifically, Wells Fargo's standard mortgage agreement provides, in part:

> Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. *If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds.* Lender may hold such unapplied funds until Borrower makes payment to bring the Loan cur-

rent, If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower.

*See* Plaintiff Stephanie Watson's Mortgage at ¶ 1, a copy of which is attached hereto as Ex. 2 (emphasis added); Plaintiff Lori Quist's Mortgage at ¶1, a copy of which is attached hereto as Ex. 3 (emphasis added).

43.     The language of the mortgage contract provides only a limited exception to Wells Fargo's obligation to pay interest on unapplied funds, when the Periodic Payment is applied as of its scheduled due date.  If the payment is not applied, Wells Fargo has an obligation to pay interest.

44.     Wells Fargo did not pay interest on the unapplied funds, even though it did not apply the funds to the mortgage on the scheduled due date.

45.     Plaintiff Watson's monthly mortgage payment was $2,302.63.

46.     On January 6, 2011, Plaintiff Watson inadvertently sent a payment in the amount of $2,002.63 instead of $2,302.63 (*i.e.*, $300 short).  On January 6, 2011, Wells Fargo placed Plaintiff Watson's $2,002.63 payment into the unapplied funds account and did not apply any of it toward principal, interest or fees.

47.     As of January 6, 2011, Wells Fargo was holding $2,002.63 of Plaintiff Watson's money in an Unapplied Funds account.

48.     On January 27, 2011, Plaintiff Watson made a payment that was sufficient to bring her account current.  Only then did Wells Fargo apply the funds from her unapplied funds account to her mortgage.

49.     Wells Fargo held $2,002.63 of Plaintiff Watson's money for approximately 21 days.  Wells Fargo did not apply that amount to Plaintiff Watson's mortgage on the scheduled due date, and Wells Fargo did not pay Plaintiff Watson any interest on that money.

50.     Wells Fargo similarly held certain payments made by Lori Quist in 2012 in an un-applied funds or suspense account.  As of August 27, 2012, the balance held by Wells Fargo in this unapplied funds / suspense account was $689.05.  Wells Fargo did not apply that amount to Plaintiff Quist's mortgage on the scheduled due date, and Wells Fargo did not pay Plaintiff Quist any interest on that money.

## CLASS ACTION ALLEGATIONS

51.     Plaintiffs bring Counts I-III of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the Pre-Application Mortgage Modification Class, which class is defined as all persons who were in-structed to miss mortgage payments by Wells Fargo as a prerequisite to getting a mortgage modi-fication, and who were damaged thereby.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

52.     Plaintiffs bring Count IV of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and a sub-class of the Pre-Application Mortgage Modification Class, which includes all Illinois residents who were in-structed to miss mortgage payments by Wells Fargo as a prerequisite to getting a mortgage modi-fication, and who were damaged thereby.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

53.     Plaintiffs bring Count V of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and a sub-class of the Pre-Application Mortgage Modification Class, which includes all individuals who were instructed by individuals licensed under the Illinois Mortgage License Act of 1987, 205 ILCS 635/1 *et seq*. to miss mortgage payments by Wells Fargo as a prerequisite to getting a mortgage modification, and who were damaged thereby.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

54.     Plaintiff Quist brings Counts VI-VIII of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the Post-Application Mortgage Modification Class, which class is defined as all persons who were instructed by Wells Fargo not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

55.     Plaintiff Quist brings Counts IX of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and the Post-Application Mortgage Modification Class, which class is defined as all Illinois residents who were instructed by Wells Fargo not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established. Specifically excluded from the Class are Defendants, Defendants' officers, directors and em-

ployees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

56.     Plaintiff Quist brings Counts X of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of herself and a sub-class of the Post-Application Mortgage Modification Class, which includes all individuals who were instructed by individuals licensed under the Illinois Mortgage License Act of 1987, 205 ILCS 635/1 *et seq.* not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established, and who were damaged thereby.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family

57.     Plaintiffs bring Counts XI-XII of this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of themselves and the Unapplied Funds Class, which class is defined as all individuals who had funds held by Wells Fargo in an "Unapplied Funds" account, "Suspense" account or similar account, and for whom the funds were not applied to the mortgage on the scheduled due date, and who received no interest payment on the unapplied funds.  Specifically excluded from the Class are Defendants, Defendants' officers, directors and employees, and members of their immediate families, and any Judge who may preside over this case and his or her immediate family.

58.     All of the Classes and Sub-Classes identified above are so numerous that joinder of all the members is impracticable.  The exact number of class members in each class is unknown at this time but can be determined through discovery.  Plaintiff believes there are hun-

dreds or thousands of potential class members in each class. Members of each class may be identified by Wells Fargo's records.

59.     Plaintiffs' claims are typical of the claims of the class as all members of the classes were similarly affected by Defendants' wrongful conduct as alleged herein.

60.     Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained competent and experienced class counsel.

61.     Common questions of law and fact predominate over any individual issues. The common questions of law and fact for the Pre-Application Mortgage Modification Class are:

(a)     Whether Defendants engaged in the conduct as alleged herein;

(b)     Whether Defendants and their employees engaged in deceptive and unfair business practices as alleged herein and in violation of applicable law;

(c)     Whether Defendants were unjustly enriched by the practices alleged herein;

(d)     Whether Defendants' conduct violates 815 ILCS 505/1, *et seq*.;

(e)     Whether Plaintiffs and Class Members are entitled to damages and the proper measure of such damages; and

(f)     Whether Plaintiffs and Class Members are entitled to other relief.

62.     The common questions of law and fact for the Post-Application Mortgage Modification Class are:

(a)  Whether Defendants engaged in the conduct as alleged herein;

(b)  Whether Defendants and their employees engaged in deceptive and unfair business practices as alleged herein and in violation of applicable law;

(c)  Whether Defendants were unjustly enriched by the practices alleged herein;

(d) Whether Defendants' conduct violates 815 ILCS 505/1, *et seq.*;

(e) Whether Plaintiff and Class Members are entitled to damages and the proper measure of such damages; and

(f) Whether Plaintiffs and Class Members are entitled to other relief.

63.     The common questions of law and fact for the Unapplied Funds Class are:

(a) Whether Defendants engaged in the conduct as alleged herein;

(b) Whether Defendants breached their mortgage contracts with the Class Members;

(c) Whether Defendants were unjustly enriched by the practices alleged herein;

(d) Whether Plaintiff Watson and Class Members are entitled to damages and the proper measure of such damages; and

(e) Whether Plaintiff Watson and Class Members are entitled to other relief.

64.     A class action is superior to all other methods to resolve this controversy because joinder of all the members is impracticable.  There will be no difficulty in managing this matter as a class action.

## COUNT I
### (For Fraudulent Misrepresentation)

65.     Plaintiffs incorporate all previous paragraphs into this Count I as if fully alleged herein.

66.     Plaintiffs bring this Count I on behalf of the Pre-Application Mortgage Modification Class.

67.     Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, when consumers inquired

about mortgage modification under the Federal programs, Defendants told the consumers they needed to miss mortgage payments in order to qualify for the programs and recommended that consumers purposely miss payments.

68.     Defendants made such false and misleading statements to Plaintiffs and Class Members.  Among other things, Defendants told Plaintiffs and Class Members that they needed to miss mortgage payments in order to qualify for a mortgage modification.

69.     Defendants knew or should have known these statements were false, and/or Defendants made these statements with complete and reckless disregard for whether the statements were true or false.

70.     Defendants intended Plaintiffs and Class Members to rely on these statements.

71.     Plaintiffs and Class Members did rely on the statements from Defendants.

72.     Plaintiffs and Class Members suffered damages as a result of the false statements in an amount to be determined at trial.  Those damages include, the fees charged to Plaintiffs and the Class Members, the penalties and interest charged to Plaintiffs and Class Members, damage to credit scores, and other damages to be determined at trial.

## COUNT II
### (For Negligent Misrepresentation)

73.     Plaintiffs incorporate all previous paragraphs into this Count II as if fully alleged herein.

74.     Plaintiffs bring this Count II on behalf of the Pre-Application Mortgage Modification Class.

75.     Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, when consumers inquired

about mortgage modification under the Federal programs, Defendants told the consumers they needed to miss mortgage payments in order to qualify for the programs and recommended that consumers purposely miss payments.

76.     Defendants made false and misleading statements to Plaintiffs and Class Members.  Among other things, Defendants told Plaintiffs and Class Members that they needed to miss mortgage payments in order to qualify for a mortgage modification.

77.     Defendants were careless in ascertaining the truth of these statements.  In fact, Defendants knew or should have known the statements were false.

78.     Defendants acted negligently and/or recklessly in making the statements to Plaintiffs and Class Members.

79.     As a result of the false and misleading statements, Plaintiffs and Class Members suffered damages in an amount to be determined at trial.

## COUNT III
### (for Unjust Enrichment)

80.     Plaintiffs incorporate all previous paragraphs into this Count III as if fully alleged herein.

81.     Plaintiffs bring this Count III on behalf of the Pre-Application Mortgage Modification Class.

82.     Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, when consumers inquired about mortgage modification under the Federal programs, Defendants told the consumers they needed to miss mortgage payments in order to qualify for the programs and recommended that consumers purposely miss payments.

83.     Defendants told Plaintiffs and Class Members to miss mortgage payments in order to qualify for a mortgage modification.

84.     Defendants then used the missed payments as a justification for charging Plaintiffs and Class Members certain fees and penalties.

85.     Defendants collected money from Plaintiffs and Class Members as a direct result of their wrongful conduct.

86.     It would be unjust to allow Defendants to retain the benefit of their illegal conduct to the detriment of Plaintiffs and the Class Members.

87.     Plaintiffs and Class Members suffered damages in an amount to be determined at trial as a result to Defendants' conduct.  Defendants should be order to disgorge the profits it reaped as a result of their wrongful conduct.

## COUNT IV
### (For Violation of the Illinois Consumer Fraud Act)

88.     Plaintiffs incorporate all previous paragraphs into this Count IV as if fully alleged herein.

89.     Plaintiffs bring this Count IV on behalf of a sub-class of the Pre-Application Mortgage Modification Class who were Illinois residents who were instructed to miss mortgage payments by Wells Fargo as a prerequisite to getting a mortgage modification, and who were damaged thereby.

90.     Plaintiffs bring this Consumer Fraud claim pursuant to the Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 *et seq*.

91.     Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, when consumers inquired

about mortgage modification under the Federal programs, Defendants told the consumers they needed to miss mortgage payments in order to qualify for the programs and recommended that consumers purposely miss payments.

92.     Defendants made false and misleading statements to Plaintiffs and Class Members.  Among other things, Defendants told Plaintiffs and Class Members that they needed to miss mortgage payments in order to qualify for a mortgage modification.  These false statements were unfair and deceptive trade practices pursuant to the statute.

93.     Defendants knew or should have known these statements were false, and/or Defendants made these statements with complete and reckless disregard for whether the statements were true or false.

94.     Defendants intended Plaintiffs and Class Members to rely on these statements.

95.     Plaintiffs and Class Members did rely on the statements from Defendants.

96.     Plaintiffs and Class Members suffered damages as a result of the unfair and deceptive trade practices by Defendants in an amount to be determined at trial.  Those damages include, the fees charged to Plaintiffs and the Class Members, the penalties and interest charged to Plaintiffs and Class Members, damage to credit scores, and other damages to be determined at trial.

## COUNT V
### (For Violation of the Illinois Mortgage License Act of 1987)

97.     Plaintiffs incorporate all previous paragraphs into this Count V as if fully alleged herein.

98.     Plaintiffs bring this Count V on behalf of a sub-class of the Pre-Application Mortgage Modification Class who were instructed by individuals licensed under the Illinois Mortgage

License Act of 1987, 205 ILCS 635/1 *et seq*. to miss mortgage payments as a prerequisite to getting a mortgage modification, and who were damaged thereby.

99.     Plaintiffs bring this claim pursuant to the Residential Mortgage License Act of 1987, 205 ILCS 635/1 *et seq*. (the "Mortgage Act")

100.     The Mortgage Act prohibits a licensee from recommending or encouraging default or encouraging a borrower to fail to make timely payments on an existing residential mortgage loan in connection with the refinancing of that loan. 205 ILCS 635/5-16.

101.     Defendants advised Plaintiffs and Class Members to miss payments on their mortgage loans in order to qualify for refinancing.

102.     As a result of following this advice, Plaintiff and Class Members suffered damages.

## COUNT VI
### (For Fraudulent Misrepresentation)

103.     Plaintiff Lori Quist incorporates all previous paragraphs into this Count VI as if fully alleged herein.

104.     Plaintiff Lori Quist brings this Count I on behalf of the Post-Application Mortgage Modification Class.

105.     Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, Defendants told Plaintiff Quist and Class Members not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.

106.     Defendants knew or should have known these statements were false, and/or Defendants made these statements with complete and reckless disregard for whether the statements

were true or false. Defendants also made these statements without disclosing to Plaintiff Quist and Class Members that, by following this advice, Defendants would charge them late fees and penalties and report the missed payment to the credit reporting agencies.

107. Defendants intended Plaintiff Quist and Class Members to rely on these statements and omissions.

108. Plaintiff Quist and Class Members did rely on the statements and omissions from Defendants.

109. Plaintiff Quist and Class Members suffered damages as a result of the false statements and omissions in an amount to be determined at trial. Those damages include, the fees charged to Plaintiff Quist and the Class Members, the penalties and interest charged to Plaintiff Quist and Class Members, damage to credit scores, and other damages to be determined at trial.

**COUNT VII**
**(For Negligent Misrepresentation)**

110. Plaintiff Lori Quist incorporates all previous paragraphs into this Count VII as if fully alleged herein.

111. Plaintiff Lori Quist brings this Count VII on behalf of the Post-Application Mortgage Modification Class.

112. Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification. Among other things, Defendants told Plaintiff Quist and Class Members not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.

113. Defendants were careless in ascertaining the truth of these statements. In fact, Defendants knew or should have known the statements were false. Defendants also made these

statements without disclosing to Plaintiff Quist and Class Members that, by following this ad-vice, Defendants would charge them late fees and penalties and report the missed payment to the credit reporting agencies.

114.     Defendants acted negligently and/or recklessly in making the statements and omissions to Plaintiff Quist and Class Members.

115.     As a result of the false and misleading statements and omissions, Plaintiff Quist and Class Members suffered damages in an amount to be determined at trial.

## COUNT VIII
### (for Unjust Enrichment)

116.     Plaintiff Lori Quist incorporates all previous paragraphs into this Count VIII as if fully alleged herein.

117.     Plaintiff Lori Quist brings this Count VIII on behalf of the Post-Application Mortgage Modification Class.

118.     Defendants had a policy or practice of providing false and misleading statements to consumers Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, Defendants told Plaintiff Quist and Class Members not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.

119.     Defendants then used the missed payments as a justification for charging Plaintiff Quist and Class Members certain fees and penalties.

120.     Defendants collected money from Plaintiff Quist and Class Members as a direct result of their wrongful conduct.

121.   It would be unjust to allow Defendants to retain the benefit of their illegal conduct to the detriment of Plaintiff Quist and the Class Members.

122.   Plaintiff Quist and Class Members suffered damages in an amount to be determined at trial as a result to Defendants' conduct.  Defendants should be order to disgorge the profits it reaped as a result of their wrongful conduct.

## COUNT IX
### (For Violation of the Illinois Consumer Fraud Act)

123.   Plaintiff Lori Quist incorporates all previous paragraphs into this Count IX as if fully alleged herein.

124.   Plaintiff Lori Quist brings this Count IX on behalf of a sub-class of the Post-Application Mortgage Modification Class who were Illinois residents who were instructed not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established, and who were damaged thereby.

125.   Plaintiff Quist brings this Consumer Fraud claim pursuant to the Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 *et seq*.

126.   Defendants had a policy or practice of providing false and misleading statements to consumers regarding mortgage modification.  Among other things, Defendants told Plaintiff Quist and Class Members not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.

127.   Defendants knew or should have known these statements were false, and/or Defendants made these statements with complete and reckless disregard for whether the statements were true or false.  Defendants also made these statements without disclosing to Plaintiff Quist

and Class Members that, by following this advice, Defendants would charge them late fees and penalties and report the missed payment to the credit reporting agencies.

128.     Defendants intended Plaintiff Quist and Class Members to rely on these statements and omissions.

129.     Plaintiff Quist and Class Members did rely on the statements and omissions from Defendants.

130.     Plaintiff Quist and Class Members suffered damages as a result of the unfair and deceptive trade practices by Defendants in an amount to be determined at trial.  Those damages include, the fees charged to Plaintiff Quist and the Class Members, the penalties and interest charged to Plaintiff Quist and Class Members, damage to credit scores, and other damages to be determined at trial.

## <u>COUNT X</u>
### (For Violation of the Illinois Mortgage License Act of 1987)

131.     Plaintiff Lori Quist incorporates all previous paragraphs into this Count X as if fully alleged herein.

132.     Plaintiff Lori Quist brings this Count X on behalf of a sub-class of the Pre-Application Mortgage Modification Class who were instructed by individuals licensed under the Illinois Mortgage License Act of 1987, 205 ILCS 635/1 *et seq*. to miss mortgage payments as a prerequisite to getting a mortgage modification, and who were damaged thereby.

133.     Plaintiff Quist brings this claim pursuant to the Residential Mortgage License Act of 1987, 205 ILCS 635/1 *et seq*. (the "Mortgage Act")

134.    The Mortgage Act prohibits a licensee from recommending or encouraging default or encouraging a borrower to fail to make timely payments on an existing residential mortgage loan in connection with the refinancing of that loan. 205 ILCS 635/5-16.

135.    Defendants advised Plaintiff Quist and Class Members not to make mortgage payments while their application for a loan modification was being processed or until a trial period plan payment amount was established.  Defendants made these statements without disclosing to Plaintiff Quist and Class Members that, by following this advice, Defendants would charge them late fees and penalties and report the missed payment to the credit reporting agencies

136.    As a result of following this advice, Plaintiff Quist and Class Members suffered damages.

## COUNT XI
### (For Breach of Mortgage Contract)

137.    Plaintiffs incorporate all previous paragraphs into this Count XI as if fully alleged herein.

138.    Plaintiffs bring this Count XI on behalf of the Unapplied Funds Class.

139.    Defendants had an identical contractual agreement with each Class Member with respect to how money held in unapplied funds accounts would be handled.

140.    The language of Wells Fargo's standard mortgage contract provides only a limited exception to Wells Fargo's obligation to pay interest on unapplied funds, when the Periodic Payment is applied as of its scheduled due date.  If the Periodic Payment is not applied as of its scheduled due date, Wells Fargo has an obligation to pay interest.

141.     Wells Fargo had a practice of holding money in unapplied funds accounts, not applying those funds on the scheduled due date, and not paying interest on those funds.

142.     This practice was a breach of the mortgage contract by Wells Fargo.

143.     As a result of this practice, Plaintiffs and Class Members were damaged in that they did not receive interest payments they were entitled to.

**COUNT XII**
**(For Unjust Enrichment)**

144.     Plaintiffs incorporate all previous paragraphs into this Count XII as if fully alleged herein.

145.     Plaintiffs bring this Count XII on behalf of the Unapplied Funds Class.

146.     The language of Wells Fargo's standard mortgage contract provides only a limited exception to Wells Fargo's obligation to pay interest on unapplied funds, when the Periodic Payment is applied as of its scheduled due date. If the Periodic Payment is not applied as of its scheduled due date, Wells Fargo has an obligation to pay interest.

147.     Wells Fargo had a practice of holding money in unapplied funds accounts, not applying those funds on the scheduled due date, and not paying interest on those funds.

148.     This practice resulted in an unjust windfall to Wells Fargo and damages to Plaintiffs and Class Members because they did not receive interest payments they were entitled to.

149.     It would be unjust to allow Wells Fargo to keep this money.

**JURY DEMAND**

150.     Plaintiffs demand a trial by jury.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and a Class of similarly situated individuals requests this Court enter an order for the following:

(a)     Accepting jurisdiction of this cause;

(b)     Certification of the case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(c)     Designation of Plaintiffs as representative of the Rule 23 Classes, and counsel of record as Class Counsel;

(d)     A declaration that Defendants' conduct was fraudulent and intentional and/or negligent misrepresentation;

(e)     A declaration that Defendants' conduct violated the Consumer Fraud and Deceptive Trade Practices Act;

(f)     A declaration that Defendants' conduct resulted in unjust enrichment to Defendants;

(g)     An award of damages, in an amount to be determined at trial, to compensate Plaintiffs and Class Members for their losses;

(h)     An award of pre-judgment and post-judgment interest;

(i)     An award of reasonable attorney's fees and costs of this action;

(j)     An award of punitive damages; and

(k)     An award of all other relief this Court deems just and appropriate.

Dated:  November 19, 2012

_____/s/ Christopher J. Werner_____
Myron M. Cherry, Esq.
Jacie C. Zolna, Esq.
Christopher J. Werner, Esq.
Myron M. Cherry & Assoc., LLC
30 North LaSalle Street, Suite 2300
Chicago, Illinois 60602
Tel. No. (312) 372-2100
***Attorneys for Plaintiffs and the Classes***